# IN THE COURT OF APPEALS OF IOWA

No. 18-1900
Filed October 9, 2019

**CEDAR VALLEY MEDICAL SPECIALISTS, PC,**
    Plaintiff-Appellee,

**vs.**

**JAMES WRIGHT, M.D.,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, George L. Stigler, Judge.

A surgeon appeals a district court order enforcing the liquidated damages provision of a covenant not to compete in his employment contract with a former employer. **AFFIRMED.**

David J. Dutton and Laura L. Folkerts of Dutton, Braun, Staack & Hellman, P.L.C., Waterloo, for appellant.

Brandon M. Schwartz and Michael D. Schwartz of Schwartz Law Firm, Oakdale, Minnesota, for appellee.

Considered by Potterfield, P.J., Greer, J., and Scott, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**GREER, Judge.**

The district court enforced a liquidated damages provision based on a violation of a covenant not to compete in a cardiothoracic surgeon's employment contract. On appeal, the doctor argues that the covenant not to compete is unenforceable and prejudicial to the public interest and, in any event, the liquidated damages provision constitutes an unenforceable penalty. We affirm the district court and remand for further proceedings.

### I. Background Facts and Proceedings.

Dr. James Wright has been a board-certified cardiothoracic surgeon since 1982. Cardiothoracic surgeons perform surgical procedures on the organs in the chest, including the heart and lungs. These procedures include open-heart surgeries, coronary artery bypasses, and valve replacements and repairs. Wright worked as a cardiothoracic surgeon in Jacksonville, Florida, Texarkana and Nacogdoches, Texas, and Mason City and Iowa City, Iowa, before being recruited to the Black Hawk County, Iowa area.

In May 2007, Cedar Valley Medical Specialists, P.C. (CVMS) and Allen Memorial Hospital entered into a recruiting agreement with Wright. CVMS and Allen Hospital have a mutual and long-standing interest of providing health care in the Black Hawk County area. Under the terms of the agreement, Wright agreed to work as a cardiothoracic surgeon for CVMS. Wright received a signing bonus, moving expenses, and a guaranteed salary regardless of the revenue he brought in or the expenses he incurred. He also did not have to agree to a covenant not to compete or a liquidated damages provision. CVMS agreed to give Wright the necessary resources and support to establish his practice and relationships in the

Black Hawk County medical community, marketing, and other benefits of a group practice. Allen Hospital agreed to pay Wright's signing bonus and moving expenses and to ensure that Wright received his guaranteed income during the two-year contract term.

In February 2009, CVMS and Allen Hospital entered into an agreement whereby CVMS agreed to provide a physician to serve as the medical director of cardiovascular surgery at Allen Hospital, and in exchange Allen Hospital would pay CVMS $10,000 per month beginning June 1. CVMS designated Wright as the physician.

In April, Wright's initial two-year contract was coming to an end and he submitted a written notice of intent to become a shareholder at CVMS as of the first of June. At the time Wright transitioned to become a shareholder, he had a deficit of $390,969.10 in expenses, which CVMS forgave.

On May 8, CVMS entered into a written employment contract with Wright, effective June 1, that contained various provisions, including noncompete language. Paragraph 2C of the contract specifically provided:

> 2C. <u>LIQUIDATED DAMAGES FOR COMPETITION</u>. For the two-year period commencing with the last day Professional is employed by Corporation and within 35 miles of Black Hawk County, Iowa, Professional agrees Professional will not practice medicine or engage in any business or practice related to medicine, nor will Professional own, manage, operate, control, be employed by, participate in, or in any fashion be connected with the ownership, management, operation, or control of any business or practice related to medicine, nor shall Professional on behalf of or in conjunction with any other person, persons, firm, partnership, agency, association, company, or corporation, call upon any patient, customer, or supplier of Corporation, for the purpose of or with the effect of soliciting or diverting or taking away from Corporation such patient, customer, or supplier.

> In the event of a breach by Professional of the provisions of this Item 2C, Professional agrees to pay Corporation as liquidated damages the greater of:
>     a. $100,000.00, or
>     b. The compensation paid by Corporation to Professional during the six months immediately preceding the termination of Professional's employment.
> In addition, in the event Corporation is required to enforce the terms of this Item and is successful in such enforcement, Professional agrees to be responsible for and pay any costs and expenses incurred by Corporation, including court costs and reasonable attorney's fees.

In 2013, CVMS and Allen Hospital entered into a Cardiovascular Surgery Call Coverage and Medical Director Services Agreement specifically geared toward providing "cardiovascular surgery services to the community." Again, Wright was the designated physician and CVMS received $301,125 annually for the call coverage and $2,000 monthly for the services of the Medical Director.

Also in 2013, Wright voiced his concerns to CVMS about the number of days and hours he was required to be on call. To address his concerns, later that same year, CVMS merged its Department of Cardiovascular/Thoracic Surgery and Department of Cardiology, appointed another physician to serve as the merged department director, and entered into an agreement with the Gunderson Clinic in La Crosse, Wisconsin, to provide backup coverage for Wright. Effective November 1, Wright would receive a guaranteed $400,000 salary and forty-two vacation days annually until July 1, 2016. Wright agreed that Schedule A of the May 8, 2009 employment contract, including the liquidated damages provision, "remain[ed] in full force and effect."

These changes did not alleviate Wright's concerns, and in July 2016, Wright told his department director that he intended to retire at the end of the year. Wright

offered to serve in an auxiliary role if his help was "desired." In the summer of 2016, Allen Hospital learned about Wright's impending retirement. On September 30, Allen Hospital gave CVMS notice that it was terminating the Medical Director Surgical Services Agreement effective December 31. On November 1, Wright gave CVMS's human resources director written notice that he would retire from CVMS effective December 31.

CVMS and Allen Hospital began attempting to recruit a physician to fill Wright's position at CVMS. Wright helped with these recruitment efforts. CVMS and Allen Hospital discussed attempting to convince Wright to stay until they were able to recruit his replacement. However, because the Allen Hospital contract with CVMS was being terminated, CVMS informed Wright that there would not be any money to keep him on past December 31. Wright also indicated that he would not be willing to continue working for CVMS but that he would be willing to contract with Allen Hospital until they found a replacement. In a November 2 email, a representative from Allen Hospital discussed the possible imposition of liquidated damages if it was to enter into such an arrangement with Wright and inquired whether CVMS would be willing to waive that provision. Nevertheless, CVMS never agreed to waive the liquidated damages.

On November 16, Wright and Allen Hospital entered into an employment agreement whereby Wright agreed to provide full-time cardiothoracic surgery services for Allen Hospital's clients beginning January 1, 2017, the day after his retirement from CVMS, until the hospital was able to hire a new full-time surgeon. During the negotiations for this contract, Allen Hospital and Wright discussed the liquidated damages provision in his CVMS employment contract. Allen Hospital

offered a plan to help with this payment, but in the end, the hospital set Wright's compensation at $727,119—over $327,000 more than he earned at CVMS—plus six weeks of vacation. Wright told Allen Hospital he would pay the liquidated damages on his own. In a paragraph titled "**Other Obligations**," Wright agreed that the employment agreement with Allen Hospital would not violate any existing contract between him and any third party. Wright also agreed to a two-year, thirty-five-mile restrictive covenant.

Wright worked full time for Allen Hospital from January 1, 2017, until February 28, 2018. All the revenues that CVMS had received from Allen Hospital for call coverage and cardiothoracic surgery were now being paid to Allen Hospital. CVMS's annual revenue for Wright's cardiothoracic surgery services in 2014, 2015, and 2016 was $596,295.23, $518,500.01, and $400,010.10, respectively.

In February 2017, CVMS sued Wright alleging he breached his employment contract by practicing medicine within thirty-five miles of Black Hawk County within two years of his last day of work for CVMS. CMVS sought enforcement of the liquidated damages provision in the contract. Wright denied breaching the contract because the liquidated damages provision was invalid, and requested a declaratory ruling that the district court adjudicate the liquidated damages clause to be unenforceable.

The case proceeded to a bench trial on June 12, 2018. The district court determined that the 2009 employment contract was enforceable against Wright such that his full-time work for Allen Hospital was a "direct violation" of that agreement. Accordingly, the court determined the liquidated damages provision applied. The court entered judgment for damages against Wright in the amount of

$215,631.68, plus interest from June 12, 2018. On October 31, 2018, Wright timely filed notice of appeal. After Wright filed his notice of appeal, CVMS filed affidavits of attorney fees and costs. For that reason, the district court has not ordered payment of any attorney fees or costs.

## II. Standard of Review.

We review equity cases de novo. Iowa R. App. P. 6.907. Whether a liquidated damages provision is an unenforceable penalty is a question of law, and we will review the district court's ruling on this issue for correction of errors at law. *City of Davenport v. Shewry Corp.*, 674 N.W.2d 79, 82 (Iowa 2004); *Rohlin Constr. Co. v. City of Hinton*, 476 N.W.2d 78, 79 (Iowa 1991).

## III. Analysis.

Restrictive covenants involving physicians have been upheld as valid and enforceable in Iowa. *Cogley Clinic v. Martini*, 112 N.W.2d 678, 681 (Iowa 1962). Because restrictive covenants involve the partial restraint of trade, we construe them against the party seeking enforcement and approve them with some reluctance. *Id.* We apply a three-pronged test to determine whether an employment contract with a restrictive covenant is enforceable: "(1) Is the restriction reasonably necessary for the protection of the employer's business; (2) is it unreasonably restrictive of the employee's rights; and (3) is it prejudicial to the public interest?" *Revere Transducers, Inc. v. Deere & Co.,* 595 N.W.2d 751, 761 (Iowa 1999) (quoting *Lamp v. Am. Prosthetics, Inc.*, 379 N.W.2d 909, 910 (Iowa 1986)).

"Essentially, these rules require us to apply a reasonableness standard in maintaining a proper balance between the interests of the employer and the

employee." *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 381 (Iowa 1983). Reasonableness of a particular restrictive covenant depends on the facts and circumstances of each individual case. *Id.* "Factors we consider in determining the enforceability of a noncompete agreement include the employee's close proximity to customers, the nature of the business, accessibility to information peculiar to the employer's business, and the nature of the occupation which is restrained." *Revere Transducers, Inc.*, 595 N.W.2d at 761. For that reason, any other CVMS noncompete covenants with other medical personnel referenced in this case are not factored into our analysis of the Wright contract. *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, 370 (Iowa), *reh'g denied and opinion modified*, 190 N.W.2d 413 (Iowa 1971).

**A. Is the Restriction Necessary for Protection of the Employer's Business?** "The employer has the initial burden to show that enforcement of the covenant is reasonably necessary to protect its business." *Dental East, P.C. v. Westercamp*, 423 N.W.2d 553, 555 (Iowa Ct. App. 1988); *see also Ma & Pa, Inc. v. Kelly*, 342 N.W.2d 500, 502 (Iowa 1984) ("The burden of proving reasonableness is upon the employer who seeks to enforce such a covenant." (quoting *Iowa Glass Depot*, 338 N.W.2d at 381)). "[T]he restriction must be no greater than necessary to protect the interests of the employer." *Mutual Loan Co. v. Pierce*, 65 N.W.2d 405, 407 (Iowa 1954). We are more likely to uphold a restrictive covenant "when the employee is placed in a position of close customer relationship and has an opportunity to pirate customers from the employer at the termination of his employment." *Iowa Glass Depot*, 338 N.W.2d at 382.

The record in this case demonstrates that the Black Hawk County area could only support one cardiothoracic surgeon, with some vacation coverage. That provider over the past nine years of employment with CVMS was Wright. During that time, CVMS promoted, supported, and recommended Wright in the Black Hawk County area. There was investment in the doctor for their mutual good. CVMS waived the $390,969.10 deficit that Wright accrued after his initial two years of practice with the clinic when he became a shareholder. By virtue of his position with CVMS as director and shareholder, Wright also has confidential knowledge about the clinic and its operations. Likewise, during the time that Wright worked for Allen Hospital, CVMS lost the benefit of revenue from his surgeries as well as the payments Allen Hospital made to support Wright. Other than the payments referenced above, specific financial losses related to competition were not detailed, but as the *Cogley Clinic* court noted, "There are too many intangibles and variable contingencies in a situation such as we have here to have the case decided on whether there has been a gain or loss of income in the first six months of the contract violation." 112 N.W.2d at 682.

Factors showing that the noncompete covenant was not necessary to protect CVMS's business are that Wright, as the sole cardiothoracic surgeon in Black Hawk County, was not competing against any other local medical provider at the time he left CVMS. *See generally Ehlers*, 188 N.W.2d at 371 (questioning *Cogley Clinic* for leading to results of "questionable equity"). Additionally, he was helping with the recruitment efforts to obtain a new surgeon to replace him at CVMS. There is no evidence that Wright solicited work or approached any former

patients. In fact, almost all patients he saw at Allen Hospital were referred to him by CVMS cardiologists. Arguably, these efforts helped enhance CVMS's business.

However, what Wright overlooks is that while there may not be a competing doctor at CVMS at the time of his work for Allen Hospital, had Wright stayed on and not violated the employment contract terms, his surgeries likely would have generated income for CVMS. Additionally, had CVMS recruited a surgeon, there are no guarantees that Wright would have stepped down at Allen Hospital and not been in direct competition. There are economic losses to a clinic if a medical provider can transition without penalty across the street to practice.

Wright also testified that he was willing to pay the liquidated damages when his period of remaining in practice in Black Hawk County was to be short term, but when it became a large penalty he thought it was unfair since he was doing "someone a favor." These are the "intangibles" that impact supporting the use of noncompete covenants between physicians and their employers. Thus, we find that CVMS has met its burden to show the necessity of the restriction in Wright's employment contract.

**B. Is the Covenant Unreasonably Restrictive?** As to the second consideration, no one argued at trial that the thirty-five mile radius and a two-year time frame from last day of employment were too restrictive. Here, on its face, the terms of the covenant not to compete between CVMS and Wright are reasonable under Iowa law and not unduly restrictive as to time or area. *See Pro Edge, L.P. v. Gue*, 374 F. Supp. 2d 711, 740–41 (N.D. Iowa 2005) (enforcing noncompete agreement with restrictions of 250 miles for one year); *Farm Bureau Serv. Co. v. Kohls*, 203 N.W.2d 209, 212 (Iowa 1972) (enforcing agreement prohibiting

competition in six townships for two years); *Ehlers*, 188 N.W.2d at 374 (enforcing modified agreement prohibiting former employee from soliciting business from individuals the employee contacted while working for employer for a period of one year); *Orkin Exterminating Co. v. Burnett*, 146 N.W.2d 320, 327 (Iowa 1966) (enforcing agreement prohibiting competition within ten miles for three years); *Cogley Clinic*, 112 N.W.2d at 681–83 (enforcing agreement prohibiting competition within twenty-five miles for a period of three years); *Phone Connection, Inc. v. Harbst*, 494 N.W.2d 445, 450 (Iowa Ct. App. 1992) (enforcing a modified agreement prohibiting solicitation of business in certain counties in Iowa and Minnesota for two years); *Dental East, P.C.*, 423 N.W.2d at 555 (enforcing agreement prohibiting competition within twenty miles for two years); *but see Rasmussen Heating & Cooling, Inc. v. Idso*, 463 N.W.2d 703, 705 (Iowa Ct. App. 1990) (refusing to enforce a ten-year noncompete agreement).

**C. Is the Restriction Contrary to Public Policy?** The third prong of the test relating to public hardship is a close call. The burden of proof that a contract is contrary to public policy is upon the person asserting such position. *Cogley Clinic*, 112 N.W.2d at 682.

Wright asserts that he was the only cardiothoracic surgeon in Black Hawk County and the next closest surgeon was fifty miles away. Restricting the only surgeon in a fifty-mile radius from performing life-saving surgeries could be deemed prejudicial to the public interest. Wright compares the facts of his case to those in *Board of Regents v. Warren*, No. 08–0017, 2008 WL 5003750 (Iowa Ct. App. Nov. 26, 2008). In *Warren*, a panel of this court held in part that a noncompete agreement between an oncologist and the University of Iowa

Hospitals and Clinics was unenforceable because imposing an injunction on the oncologist would be prejudicial to the public interest as there was a shortage of oncologists in the Cedar Rapids area and restricting the oncologist's ability to practice in Linn County would negatively impact the Cedar Rapids community. 2008 WL 5003750, at *5-6.

In response to Wright's assertion that he was the sole cardiothoracic surgeon in Black Hawk County and that the public would be harmed, CVMS detailed that (1) the surgeries Wright performed were scheduled by patients, (2) only three to four emergent cases occurred annually, (3) there are cardiologists in Waterloo and other cardiac surgeons near Black Hawk County, (4) typically a locums tenens physician could cover the surgeries if Wright was unavailable,[1] and (5) other hospitals, such as Mayo Clinic, were available to Black Hawk County residents.

In communities across Iowa, and as we noted in the *Warren* case, the shortage of physicians can impact the public welfare of the community. Id. However, based on the facts of this case including the limited number of emergent surgeries Wright performed and the admitted need for only one cardiothoracic surgeon in Black Hawk County, the record supports that the community needs are being accommodated by the hospitals in the general area of Black Hawk County. Further, unlike the hospital in *Warren*, CVMS is not seeking an injunction to prevent Wright from practicing in the area. Instead CVMS is seeking enforcement of the

---

[1] A "locum tenens" is a licensed physician who will travel to and work on a short-term basis for hospitals that need temporary coverage for a physician during his or her vacations and holidays.

liquidated damages provision to make up for the losses it incurred when Wright left to go work for another hospital in the area.  As opposed to a complete prohibition to practice, this contract clause is more like a "buy back into the market" option.  *Intermountain Eye & Laser Ctrs., P.L.L.C. v. Miller*, 127 P.3d 121, 127 (Idaho 2005) (referencing impact of noncompete clause allowing payment to compete).  We conclude Wright has not met his burden of showing the lack of appropriate and sufficient health care coverage to render the noncompete agreement unenforceable on public policy grounds.

**D.  Is the Liquidated Damages Clause Enforceable?**  Finally, Wright argues that the liquidated damages payment of $215,631.68 is a penalty and cannot be enforced.  Wright has the burden of proof on this issue.  *Carroll v. Reo, L.L.C.*, No. 15–0487, 2016 WL 4051565, at *3 (Iowa Ct. App. July 27, 2016).  Iowa law allows contractually prescribed liquidated damages so long as those damages do not constitute a penalty.  *Aurora Bus. Park Assocs., L.P. v. Michael Albert, Inc.*, 548 N.W.2d 153, 155 (Iowa 1996).

The Iowa Supreme Court adopted the following two-factor test to determine if liquidated damages are a penalty:

> The first factor is the anticipated or actual loss caused by the breach. The amount fixed is reasonable to the extent that it approximates the actual loss that has resulted from the particular breach, even though it may not approximate the loss that might have been anticipated under other possible breaches.  Furthermore, the amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss.  The second factor is the difficulty of proof of loss. The greater the difficulty either of proving that loss has occurred or of establishing its amount with the requisite certainty, the easier it is to show that the amount fixed is reasonable.

*Rohlin Constr. Co.*, 476 N.W.2d at 80 (quoting Restatement (Second) of Contracts § 356(1) cmt. *b* (Am. Law Inst. 1981)). The liquidated damages clause should compensate for the loss as opposed to punishing for the breach. *Id.* at 81.

The terms for the liquidated damages claim were set forth in Wright's employment contract. Wright is an intelligent and sophisticated surgeon who had a previous contract with CVMS that did not contain a noncompete or liquidated damages provision. Additionally, after Wright left CVMS, he negotiated a salary of $727,000, which was $327,000 more than what he made in previous years at CVMS. The record confirms that negotiations occurred with the payment of the liquidated damages in mind. Additionally, CVMS argues that they lost recruitment and support capital, the two-year deficit of $390,969.10 that Wright was not required to repay, and several thousand dollars of lost revenue over the time Wright worked at Allen Hospital. Given the expenses of initial recruitment and promotion, the deficit forgiven, the loss of payments for call coverage, surgeries, and medical director services, the liquidated damages provision is reasonable as it does not exceed CVMS's anticipated losses as a result of Wright's breach of the noncompete agreement.

## IV. Disposition.

For the foregoing reasons, we affirm the district court judgment and remand the case for additional proceedings related to attorney fees and costs.

**AFFIRMED.**